IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| Paula Brown, | : |
| | : Case No. 1:07-cv-1039 |
| Plaintiff, | : |
| | : Chief Judge Susan J. Dlott |
| v. | : |
| | : ORDER GRANTING IN PART AND |
| Clarke Power Services, Inc., | : DENYING IN PART MOTION FOR |
| | : SUMMARY JUDGMENT |
| Defendant. | : |

This matter comes before the Court on Defendant's Motion for Summary Judgment (doc. 18). In this case, Plaintiff Paula Brown has sued her former employer, Defendant Clarke Power Services, Inc. ("CPSI"), for gender discrimination, age discrimination, violation of the Equal Pay Act, and breach of Ohio public policy. For the reasons that follow, CPSI's motion is **GRANTED IN PART** and **DENIED IN PART**. Summary judgment is **GRANTED** to CPSI on the Equal Pay Act and breach of Ohio public policy claims, but is **DENIED** as to the discrimination claims.

I.  **BACKGROUND**

Unless otherwise noted, the following facts are derived from Defendant's Proposed Undisputed Facts (doc. 27) and Plaintiff's Response thereto (doc. 29) and are taken as true for purposes of the Motion for Summary Judgment.

A.  **Clarke Power Services, Inc.**

CPSI consists of two separate companies. One company is a distributorship for Detroit Diesel Corporation and it is referred to as "Clarke Power." The core of Clarke Power's business is repair of trucks. There are twenty-eight Clarke Power locations and they are service outlets

1

for trucking companies. Clarke Power provides services and sells related parts such as engines, transmissions, and generators at its locations. Clarke Power's President and CEO is Mark Andreae.

The other component company of CPSI is Clarke Fire and Protection Products ("Clarke Fire"). Clarke Fire was spun off as a wholly-owned subsidiary of CPSI in 2002. Clarke Fire builds and sells diesel fire pump drivers for building sprinkler systems. Clarke Fire's President and CEO is Dane Petrie.

Plaintiff appears to use the term "the Company" to refer interchangeably to either or both CPSI and Clarke Power, especially for events occurring after Clarke Fire was spun off as a wholly-owned subsidiary. The parties have not explained any practical difference between CPSI and Clarke Power after 2002. Therefore, this Court will use the term "the Company" to refer to either CPSI or Clarke Power for events that occur after Clarke Fire was spun off in 2002.

**B.      Paula Brown's Employment History with CPSI**

Plaintiff Paula Brown (DOB 1952) began her employment at CPSI in 1974 performing data entry work. (Brown Dep. 4.) Mark Andreae became President and CEO of CPSI in 1985. At that time Brown was the sole employee in CPSI's Information Technology Department ("IT Department"). As such, she was considered the manager of the IT Department. Brown implemented an IBM computer system called the AS/400 as the Company's primary distribution system. (Andreae Dep. 16.)

Between 1985 and 2003, CPSI's business grew dramatically from a mid-$20 million business to an approximately $150 million or greater business. In 2003, Clarke Power began a business planning process with an outside consultant which caused the Company to search for

individuals to take on leadership positions in each area of responsibility within Clarke Power. Andreae discussed with Brown whether she wanted to take the leadership position within the IT Department. (Andreae Dep. 18-19.) Andreae testified that he and Brown jointly agreed that Brown would not take the leadership position and instead they searched for and hired a person outside the company to head the IT Department. (Id.) Brown testified that she did not tell Andreae that she did not want the management position, but rather that she would "go with it" if Andreae wanted to hire someone else for the position for the benefit of Clarke Power. (Brown Dep. 12-13.) The decision for Brown to no longer serve as the head of IT Department did not result in the loss of any salary or benefits. Rather, Brown retained her salary, plus long-term disability insurance and life insurance.

Mark Brinkman (DOB 1964) was hired in September 2003 as the Director of IT for CPSI. Brown participated in Brinkman's interviews for the position. In addition to serving as Director of IT, Brinkman also was placed on the CPSI's "Steering Team," an executive team that drives the strategic vision of the CPSI. Brinkman's educational background included an MBA degree with a concentration in Information Systems in 2002 and he had prior experience in the information technology industry. Brown concedes that Brinkman had a broader range of IT knowledge and management experience than her. Brinkman was informed during his interviews for the position that CPSI was shifting from a sale-of-parts business to a retail service business. The Company wanted the IT Director to help steer it in the right direction for this process.

Around the time that Brinkman was hired, CPSI implemented a new computer system called the Made2Manage system, a PC-based system. (Andreae Dep. 18-19.) The Company had PCs at all of its locations. (Brinkman Dep. 28.) Made2Manage was the business system for

3

Clarke Fire whereas the AS/400 was the business system for Clarke Power.  Brown continued to provide support for the AS/400 system in a PC environment.  (Id. at 29.)  However, Brown did not have the knowledge in 2003 to perform day-to-day operations in the Made2Manage system.  Brown's knowledge in the Made2Manage system expanded from 2003 through 2007.  (Id. at 33, 64-66.)  Her duties regarding Made2Manage primarily were administrative, such as installing new clients or new users and changing passwords.  (Id. at 31, 40-41.)

For the first several months after Brinkman was hired, he noticed that the Company had PC-, server-, and network-related problems for which it was utilizing an outside consultant, ICS.  (Id. at 49-50.)  The Company was spending between $6,000 and $9,000 per month on ICS services.  Brinkman recommended that the Company hire a third full-time IT employee to reduce the monthly ICS expense.  The Company hired Dave Longtin (DOB 1969) as a Systems Engineer in March 2004.  The ICS expense for these services dropped because of the increased manpower hours within the in-house IT Department.  (Id. at 51.)  However, the Company continued to use ICS for different services.  Brinkman and Longtin had worked together previously at a different company, an outsourcing company called Intex Corporation.  Longtin had experience working on different companies' networks.  Longtin spent significant time after he was hired in 2004 rolling out a new computer networking system and its various components.  (Id. at 55.)  Brown testified that she assisted Longtin with his regular duty of loading PCs and laptops when the IT Department "got backed up." (Brown Dep. 25-26.)

CPSI hired a fourth IT Department employee, Randy Gilman (DOB 1970) in June 2006.  Gilman also had worked with Brinkman at Intex Corporation.  Brinkman and Andreae testified that Gilman was hired to provide server, laptop, desktop and application support.  (Brinkman

4

Dep. 63.) Gilman had no prior experience on the AS/400 system. (Id. at 62.) Brinkman testified that Brown had the skills, education, and experience necessary to fulfill the duties of the IT position for which Gilman was hired. (Id. at 63-65.) Dianne Lotz, the Human Resources Generalist, testified that all the positions within the IT Department were technical and required the employees to work on the different systems. (Lotz Dep. 22.)

CPSI asserts that the Company's business began to significantly deteriorate, approximately 20%, after the first quarter of 2006. Andreae testified that Clarke Power was hurt by the loss of two major clients, Workhorse Chassis in the 2004 and 2005 time frame and Monaco Coach in February 2007. (Id. at 39-42.) Brinkman testified that the hiring of Gilman in June 2006 had been delayed by a business decline earlier that year. (Brinkman Dep. 80-81.)

In October 2006, Clarke Power made reduction-in-force ("RIF") terminations based on a requirements and needs test made at each of the Company's twenty-eight locations. The initial layoffs were of customer support personnel and mechanics. The Company laid off thirteen mechanics between October 20, 2006 and November 28, 2006. In November 2006, Clarke Power determined that another round of lay-offs were needed. The Company's Steering Committee met with Human Resources to plan the lay-offs and a restructuring of the business. Thirteen more employees, including hourly, non-exempt hourly, and salaried employees were laid off in December 2006.

Andreae determined that Clarke Power needed to make further reductions in force in February 2007 after the Company learned it was likely to lose Monaco Coach, which accounted for 15% of the Company's total revenue, as a customer. Clarke Power terminated nineteen more employees in February 2007, including Brown and two members of the Company's Steering

Committee, plus other mechanics, non-exempt hourly employees, and salaried employees. All of the employees laid off as part of the February 2007 RIF were more than forty years old. (Lotz Dep. 52.) The median age of employees for Clarke fell from around forty-eight to fifty years old before the February 2007 RIF down to forty-four years old at an unspecified date after the RIF. (Id.)

Andreae personally made the decision to terminate Brown and the other employees using what he called a "form and function" analysis. (Andreae Dep. 47-50.) He explained that he determined:

> What jobs need to get done? What does the new form and reporting system have to look like? What do we expect the business to look like when it is done?"

(Id. at 50.) Andreae did not consult with other senior management in making the decisions, at least in part because three of them were being terminated as part of the RIF. (Id. at 51, 55.)

Andreae also made the decision to sell the Clarke Fire business in February 2007. (Id. at 51.) The sale of the Clarke Fire business had not been completed as of the date of the parties' briefing in February 2009. (Id.) Andreae testified that his decision to terminate Brown from the IT Department was influenced by his belief that he would have to assign and transfer one IT Department employee to Clarke Fire as part of the sale of Clarke Fire, a PC-based business. (Id. at 50-53.) Only two employees would be left in the IT Department after the RIF and the planned sale of Clarke Fire. (Id.)

Andreae also intended to look for a new computer system to replace the AS/400 system for the remaining Clarke Power business. (Id. at 53-54.) Andreae did not believe that Brown had sufficient knowledge and skills on the PC or file server side of the business to implement a new system to replace the AS/400 system. (Id. at 54.) Despite Andreae's testimony about the

6

Company's plans, the Company has not replaced the AS/400 system as of late 2008. (Brinkman Dep. 47.) Brinkman testified that he has looked for systems to replace the AS/400, but because of market conditions "for the near future there's not going to be any immediate plans that that's going to change." (Id.)

Andreae did not consult Brinkman about the decision to terminate Brown from the IT Department because the planned sale of Clarke Fire was subject to a confidentiality agreement. (Andreae Dep. 51-52.) Andreae testified that he did not know what Brown's day-to-day activities were as compared to those of Longtin and Gilman. (Id. at 63.) Andreae did not know whether Brown had the knowledge and ability to perform the day-to-day duties which Longtin performed, but he did not think that she had the knowledge to perform the duties which Gilman performed. (Id. at 60-61.) Andreae based his understanding of Brown's knowledge and skills regarding file servers and PC systems on discussions he had had with Brinkman in 2003, four years earlier. (Id. at 61-62.) Andreae did not know whether Brown had trained on the Made2Manage system during the period from 2003 through her termination. (Id. at 62.)

Dianne Lotz, CPSI's Human Resources Generalist, testified that Andreae led her to believe that he made the February 2007 RIF decisions based upon the salary of the employees. (Id.) The employees terminated were considered highly compensated employees. (Id. at 51-52.) In his deposition, Andreae denied emphasizing to Lotz that the salary of the terminated employees was a determinative factor in the terminations. (Andreae Dep. 76.) Instead, he testified that the decisions were based on his form and function analysis. (Id.) Clarke Power has not hired any new employee for the IT Department since Brown was terminated.

The employees in the IT Department at Clarke Power received both salary and bonuses

7

as compensation. (Andreae Dep. 32-35; Brown Dep. 17.) Brown understood her bonuses to be based on a formula in which a percentage of her base salary was increased by a multiplier based on the Company's and the IT Department's performance. (Brown Dep. 18.) However, Andreae testified that he had the discretion to vary the amount of the bonus upward or downward or to eliminate the bonus structure altogether. (Adreae Dep. 35.) For the years 2003 through 2007, Brown had a lower base salary than Longtin, but a higher percentage of her salary in bonus, resulting in a higher total compensation package. Likewise, in 2006, she had a lower base salary than Gilman, but a higher percentage of salary in bonus, resulting in a higher total compensation package. (Lotz Aff. ¶¶ 5-8.)

**C.    Procedural History**

Brown initiated this action against CPSI on December 21, 2007. She alleges six causes of action against CPSI: (1) age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, et seq.; (2) age discrimination in violation of Ohio Revised Code ("O.R.C.") Chapter 4112; (3) gender discrimination in violation of Title VII, 42 U.S.C. § 2000e, et seq.; (4) gender discrimination in violation of O.R.C. Chapter 4112; (5) violation of the Equal Pay Act ("EPA"), 29 U.S.C. § 206; and (6) breach of Ohio public policy. CPSI filed an Answer denying the claims stated against it on February 14, 2008. (Doc. 2.)

Thereafter, on December 30, 2008, CPSI filed the pending Motion for Summary Judgment as to all the claims stated against it. Brown opposes the motion as to the discrimination and the EPA claims. Brown does not oppose the motion as to her Ohio public policy claim.

## II. STANDARDS GOVERNING MOTIONS FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate if "there is no genuine issue as to any material fact" and "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). On a motion for summary judgment, the movant has the burden of showing that no genuine issues of material fact are in dispute, and the evidence, together with all inferences that can permissibly be drawn therefrom, must be read in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585-87 (1986).

The movant may support a motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings but must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986). The nonmoving party must "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). The Court's task is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Liberty Lobby, 477 U.S. at 249. A genuine issue for trial exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." Id. at 252.

## III. ANALYSIS

### A. Gender Discrimination

Brown alleges that she was selected for termination during the February 2007 RIF on the

basis of her gender in violation of Title VII and the O.R.C. Chapter 4112. Title VII prohibits an employer from discriminating against an employee, with respect to the terms, conditions, and privileges of one's employment, on the basis of gender. 42 U.S.C. § 2000e-2(a). State law prohibits the same conduct, O.R.C. § 4112.02(A), "and is generally construed in identical fashion to Title VII." Shoemaker-Stephen v. Montgomery County Bd. of Com'rs, 262 F. Supp. 2d 866, 874 (S.D. Ohio 2003).

CPSI moves for summary judgment on this claim on the grounds that Brown can not establish a prima facie case of gender discrimination. To establish a prima facie case of gender discrimination claim under Title VII or the Ohio Revised Code, a plaintiff ordinarily must show that: (1) she is a member of a protected group; (2) she was subjected to an adverse employment decision; (3) she was qualified for the position; and (4) she was replaced by a person outside the protected class, or similarly situated non-protected employees were treated more favorably. Peltier v. United States, 388 F.3d 984, 987 (6th Cir. 2004). However, in a RIF case, the plaintiff can establish the fourth element of a prima facie case with evidence of "additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons." Blair v. Henry Filters, Inc. 505 F.3d 517, 529 (6th Cir. 2007) (citation omitted).

CPSI does not dispute that Brown can establish the first three elements of her prima facie case. Brown is a female, she was qualified for her position in CPSI's IT Department, and she was terminated from her position with CPSI. CPSI contends that Brown does not have evidence to establish the fourth element, that CPSI singled her out for discharge because she was female. Instead, CPSI asserts that Andreae, the Company's President and CEO, made the termination

10

decision after performing a "form and function" analysis. Andreae testified that he selected Brown for termination based on his assessment that she lacked the skills required to fill the IT Department's future needs. This Court is mindful that prima facie elements are "context-dependent." Id. The "key question is always whether, under the particular facts and context of the case at hand, the plaintiff has presented sufficient evidence to permit a reasonable jury to conclude that he or she suffered an adverse employment action under circumstances giving rise to an inference of unlawful discrimination." Id.

Contrary to CPSI's argument, the evidence is sufficient to establish a prima facie case. CPSI's decision to terminate the sole female employee, the one with the most experience on the AS/400 system utilized by Clarke Power, creates an inference of gender discrimination. Haynes v. Northrop Grumman Mission Sys., No. 3:05-cv-303, 2007 WL 2688277, at *7 (S.D. Ohio Sept. 11, 2007) (stating in the context of a RIF age discrimination case that "[a] plaintiff can establish the fourth prong by showing that she possessed superior qualifications to those of a younger co-worker who was retained."). Longtin, Gilman, and Brown each held one of the three positions in Clarke Power's IT Department under the Department Manager. All of the positions were technical and required working on the different systems. Brown testified that she helped perform at least one of Longtin's duties, loading the PCs and laptops, when necessary. The Director of the IT Department, Brinkman, testified that Brown's skill and experience on the Made2Manage system had grown and, specifically, that Brown could have performed the duties of the position for which Gilman was hired. Additionally, in at least one respect Brown was more qualified than the IT Department employees who CPSI retained. Brown had approximately twenty more years of experience with the Company than Longtin or Gilman. She

11

had the most experience and knowledge working on the AS/400 system. Brinkman testified that there was "some loss of knowledge" on the AS/400 system when Brown was terminated. (Brinkman Dep. 34.) An inference of discrimination arises in this situation.

Given that Brown has established her prima facie case, the Court must proceed to the next steps of the McDonnell Douglas burden-shifting analysis. CPSI states as its legitimate non-discriminatory reason for terminating Brown that market pressures and the Company's declining performance created the need for RIF terminations and that Andreae selected Brown for termination based on his assessment that she lacked the skills required to fill the IT Department's future needs. Specifically, Andreae believed that Brown was less qualified than her male co-workers to support PC-based systems such as Made2Manage or to assist in finding a replacement system for the AS/400. The burden shifts then to Brown to prove that the proffered legitimate, non-discriminatory reason is pretextual.

A plaintiff may establish pretext by showing that the employer's proffered reason for an employment decision had no basis in fact, did not actually motivate the decision, or was insufficient to motivate the decision. Kocsis v. Multi-Care Mgmt., Inc., 97 F.3d 876, 883 (6th Cir. 1996). Generally, an employer's honestly held belief in the reason it discharged an employee cannot be found pretextual on the basis that it may have been objectively incorrect. Majewski v. Automatic Data Processing, Inc., 274 F.3d 1106, 1117 (6th Cir. 2001). A reasonable jury here could find sufficient evidence of pretext not simply on the grounds that Andreae's stated reasons were objectively incorrect, but also that Andreae's stated reasons were not worthy of credence. "Proof that the employer's explanations for its discharge decision are unworthy of credence is a form of circumstantial evidence that may support a finding of

12

intentional discrimination . . . .'" McGrath v. Lockheed Martin Corp., 48 F. App'x 543, 553 (6th Cir. 2002).

Andreae made the termination decision without consulting Brinkman, the Director of the IT Department who had greater day-to-day supervision of Brown, or any other management level employee. Andreae based his belief about Brown's knowledge and skills regarding file servers and PCs on conversations he had with Brinkman four years before Brown's termination. He further admitted that he did not know if Brown had trained on Made2Manage during the period between 2003 and 2007. Andreae did not know Brown's daily duties compared to those of Longtin and Gilman. Brinkman, on the other hand, testified that Brown's competency had increased on the Made2Manage system and that she had the skills and knowledge to perform the duties of Gilman's position. In these circumstances, a jury could reject Andreae's stated basis for terminating Brown because his beliefs about Brown's qualifications, even if honestly held, do not appear to have been reasonable or based on particularized facts. Clay v. United Parcel Serv., Inc., 501 F.3d 695, 713-14 (6th Cir. 2007) (stating that the burden is on the employer to point to specific facts that it had at the time the decision was made which would justify its belief in the proffered reason).

Further, to the extent that Andreae terminated Brown in part based on assumptions that Clarke Fire would be sold and that the AS/400 system would be replaced, neither planned event has occurred. A reasonable jury could question why Andreae believed business to be declining sufficiently to require RIF terminations, but to be stable enough to warrant the transition to a costly new computer system. The AS/400 system remained in use as of late 2008, but the employee with the most experience in supporting the system has been terminated. Finally,

13

Andreae and Lotz, the Human Resources Generalist, offered contradictory testimony regarding whether the salaries of the terminated employees was a determinative factor in the February 2007 RIF terminations. This inconsistent testimony is further evidence that a disputed issue of material fact exists surrounding the reason for Brown's termination.[1]

The Court will deny summary judgment to CPSI on Brown's gender discrimination claims. A genuine issue of material fact remains in dispute regarding whether CPSI terminated Brown on the basis of her gender.

**B.     Age Discrimination**

Brown also asserts claims for age discrimination in violation of the ADEA and O.R.C. Chapter 4112. The McDonnell Douglas framework set forth in the previous section applies to age discrimination claims as well. Mitchell v. Toledo Hosp., 964 F.2d 577, 582 (6th Cir. 1992).

The ADEA makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a). To establish a claim under the ADEA, a plaintiff-employee must show that "the protected trait (under the ADEA, age) actually motivated the employer's decision"– that is, the employee's protected trait must have "actually played a role in [the employer's decisionmaking] process and had a determinative influence on the outcome." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 141 (2000) (quoting Hazen Paper Co. v. Biggins, 507 U.S. 604, 610

---

[1] The Court does not intend to imply that the above-described evidence is the only evidence which could support a finding that CPSI's stated reason for Brown's termination was pretextual. Nor does the Court intend to imply that a reasonable jury should find pretext given this evidence. The Court finds only that a genuine issue of material fact remains in dispute for a jury to determine.

(1993)).

The Court's analysis of the age discrimination claims closely tracks its analysis of the gender discrimination claim. The Court will not restate that full analysis here. As for Brown's prima facie case, it suffices to note that Brown was the oldest employee in the IT Department by twelve years. CPSI's stated legitimate non-discriminatory reason remains the same. Likewise, the analysis of pretext is almost identical.

In addition to the evidence of pretext discussed in the gender discrimination analysis, Brown points to the fact that all of the employees terminated in the February 2007 RIF were over the age of forty and that the median age of employees for the Company fell by four to six years after the RIF. The Sixth Circuit has stated the following regarding the use of statistical evidence:

> Appropriate statistical data showing an employer's pattern of conduct toward a protected class as a group can, if unrebutted, create an inference that a defendant discriminated against individual members of the class. To do so, the statistics must show a significant disparity and eliminate the most common nondiscriminatory explanations for the disparity.

Bender v. Hecht's Dept. Stores, 455 F.3d 612, 622 (6th Cir. 2006). Brown has not provided sufficient statistical information here. For example, Brown has not identified the ages of the employees retained to compare against the ages of the employees terminated. The testimony upon which Brown relies is non-specific as to when after the RIF the median age of employees at the Company fell four to six years. Without more, the mere fact that the terminated employees were over the age of forty is not probative of a discriminatory intent.

Even without this statistical evidence, Brown has put forward sufficient evidence to survive summary judgment. Brown's prima facie evidence, plus the evidence that Andreae's decision to terminate Brown was not based on particularized evidence and that it lacked

credence, is sufficient to create a genuine issue of material fact as to whether Andreae terminated Brown on the basis of her age. The Court will deny summary judgment to CPSI on Brown's age discrimination claims.

**C.    Equal Pay Act**

In the next claim, Brown asserts a violation of the EPA, 29 U.S.C. § 206(d)(1). The EPA generally prohibits an employer from discriminating "between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." 29 U.S.C. § 206(d)(1). "To establish a prima facie case under the Equal Pay Act, a plaintiff must show that the defendant paid higher wages to employees of the opposite sex for substantially equal work." Ambrose v. Summit Polymers, Inc., 172 F. App'x 103, 105 (6th Cir. 2006). CPSI moves for summary judgment on the grounds that Brown received higher total wages than either Longtin or Gilman during the relative years. The Court assumes for purposes of this analysis that Brown performed substantially equal work as Longtin and Gilman.

The key facts are not in dispute. Brown had a lower base salary than Longtin, but a higher percentage of her salary in bonus, resulting in a higher total compensation package for the years 2003 through 2007. Similarly, Brown had a lower base salary than Gilman, but a higher percentage of salary in bonus, resulting in a higher total compensation package for the year 2006. Brown contends that her bonus pay should not be considered for purposes of the EPA because Andreae had discretion to adjust bonus pay upward or downward and because her bonus

16

rate had declined over time.

The Code of Federal Regulations ("C.F.R.") governs this issue. The C.F.R. provides guidance on the meaning of the term "wages" used in the 29 U.S.C. § 206(d)(1): "the term 'wages' generally includes all payments made to [or on behalf of] an employee as remuneration for employment [and] . . . includes all forms of compensation . . . whether called wages, salary, . . . bonus, . . . or some other name." 29 C.F.R. § 1620.10. Based on the C.F.R. definition, the bonus payments should be used to calculate wages for the purposes of the EPA. See Disler v. Target Corp., No. 3:04-cv-191, 2005 WL 2127813, at *23 (E.D. Tenn. Aug. 31, 2005) (stating that bonus payments must be included in calculation of wages for purposes of EPA); Marting v. Crawford & Co., 203 F. Supp. 2d 958, 966 (N.D. Ill. 2002) (holding that female employee could not state an EPA violation claim when her wages were higher than the male comparator's based on her higher bonus); Gallagher v. Kleinwort Benson Gov't Sec., Inc., 698 F. Supp. 1401, 1404-05 (N.D. Ill. 1988) (holding that a female trader could not state a claim for EPA violation because her wages were higher than that of her male colleague's when her bonus payment was calculated as part of the total wage). Accordingly, Brown's wages were higher than the wages of Longtin or Gilman for each of the relevant years for purposes of the EPA. Brown's claim for violation of the EPA fails on the merits.[2]

---

[2] The Sixth Circuit's decision in Bence v. Detroit Health Corporation, 712 F.2d 1024 (6th Cir. 1983), does not require a different result. The appeals court found in dicta in Bence that a "equal total renumeration" defense failed where the female employees were paid a lower commission rate per sale of spa membership. Id. at 1025-28. However, the Bence decision did not specifically address the situation here where the female employee had a lower base salary but greater bonus payment. Additionally, the appeals court stated that its holding in Bence was "narrow." Id. at 1031. The appeals court held only that "an employer may not avail itself of the affirmative defense under § 206(d)(1)(iv) where it compensates male and female employees solely for selling the exact same product, only female employees can be compensated at a lower

17

The Court **GRANTS** summary judgment to CPSI on the Equal Pay Act claim.

**D.** **Violation of Ohio Public Policy**

Because Brown explicitly does not oppose summary judgment on this claim, (doc. 22 at 1 n.1), the Court **GRANTS** summary judgment to CPSI on the Ohio public policy claim.

**IV.** **CONCLUSION**

For the foregoing reasons, Defendant CPSI's Motion for Summary Judgment (doc. 18) is **GRANTED IN PART** and **DENIED IN PART**. The Court **GRANTS** summary judgment to CPSI on the Equal Pay Act and Ohio public policy claims. The Court **DENIES** summary judgment to CPSI on the gender and age discrimination claims.

IT IS SO ORDERED.

       s/Susan J. Dlott
Chief Judge Susan J. Dlott
United States District Court

---

commission rate, and the differential is not justified by any difference in economic benefit to the employer." Id. Finally, the effective date for the governing C.F.R. regulation is August 20, 1986, approximately three years after Bence was issued.